IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| **CARRIE ANN GADDISON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) Case No. 4:15-CV-106-KOB |
| | ) |
| **CAROLYN W. COLVIN,** | ) |
| **Acting Commissioner** | ) |
| **Social Security Administration,** | ) |
| | ) |
| **Defendant** | ) |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

On April 12, 2011, the claimant, Carrie Ann Gaddison, filed applications for disability insurance benefits and Supplemental Security Income (SSI). The claimant originally alleged disability beginning on December 30, 2007, but at the hearing orally amended the alleged onset date to be January 1, 2008. (R. 76).[1] After the Social Security Administration denied the claims initially on October 28, 2011, the claimant filed a written request for hearing before an ALJ on December 19, 2011. (R. 161-174). On March 28, 2013, the ALJ held a video hearing. (R. 93).

In a decision dated May 13, 2013, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, therefore, was ineligible for disability insurance benefits and SSI. (R.85). On June 19, 2013, the claimant filed a Request for Review of Hearing

---

[1] The claimant filed her first claim for disability insurance benefits and supplemental security income on September 22, 2009. Because the Social Security Administration already conclusively adjudicated that claim on March 24, 2011, this appeal only considers her eligibility for Social Security benefits since that date. However, the court considered all the medical records submitted by the claimant, including records prior to March 25, 2011. (R. 76-77).

1

Decision/Order for the Appeals Council to review this decision. (R. 27). The Appeals Council denied the claimant's request for review on November 17, 2014, indicating that the new evidence submitted by the claimant on August 22, 2013 related to a later time and was not relevant to whether the claimant was disabled on or before the date of the ALJ's decision. The Appeals Council informed the claimant that if she disagreed with the decision, she could seek court review. (R. 1-2).

Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court reverses the decision of the Commissioner and remands the case to the ALJ.

## II. ISSUES PRESENTED

The claimant presents the following issue for review: whether the Appeals Council erred by failing to remand in light of the new, chronologically relevant, and material evidence the claimant submitted to the Appeals Council on August 22, 2013 after the ALJ's decision on May 13, 2013.[2]

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the ALJ applied the correct legal standards and if substantial evidence supports the factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*,

---

[2] Although the claimant raised multiple issues on appeal, the court bases its reversal of the ALJ's opinion upon this issue alone.

129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No...presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo.* The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions...but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the

record in its entirety and take account of the evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. §423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. §423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subtpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

The claimant in a proceeding may submit evidence without restriction until the ALJ renders his decision. 42 U.S.C. § 402(j)(2). Additionally, the claimant may present new, chronologically relevant, and material evidence to the Appeals Council, and the Appeals Council must consider such evidence in determining whether to review the ALJ's decision. *Washington v. Comm'r of Soc. Sec. Admin.*, 806 F.3d 1317, 1320 (11th Cir. 2015). New evidence is material if a reasonable possibility exists that the new evidence would change the administrative result. *Id.* at 1321. Furthermore, evidence is chronologically relevant if it relates back to the issues that were

present during the alleged disability period, rather than showing a condition that may have developed in the time since the ALJ's decision. *Belyeu v. Colvin*, 2015 WL 1490115 at *5 (N.D. Ala. 2015).

## V. FACTS

The claimant was 31 years old on the alleged disability onset date. (R. 83). The claimant has an eleventh grade education, and her past work experience includes employment as a certified nurse's aide. (R. 112, 272). The relevant period of claimant's alleged disability began on March 25, 2011. (R. 77). The claimant originally alleged she was unable to work because of fibromyalgia, back pain, a rod and screws in her back, pain and numbness in both legs, difficulty walking, neck pain, high blood pressure, muscle spasms, nervousness, anxiety, depression, difficulty sleeping, and PTSD. (R. 271). At the ALJ hearing, the claimant testified that she was unable to work because of uncontrollable back pain, severe numbness on her left side, and congestive heart failure (CHF). The claimant stressed that the chronic back pain was the primary reason she could not work. (R. 96).

*Mental Limitations*

Dr. Henry Born, a family practitioner, examined the claimant on March 19, 2009, at the request of the Disability Determination Services, regarding her first benefits claim. Dr. Born noted that the claimant "appear[ed] anxious and perhaps depressed" although he did not detect a thought disorder. (R. 630).

On October 19, 2010, Dr. Sai Gutti, a neurologist, examined the claimant upon a referral

from Dr. Gopal Majmundar.[3] Dr. Gutti evaluated the claimant's records and marked her mental status as "depressed." (R. 347-48).[4]

On October 21, 2010, the claimant referred herself for a psychiatric evaluation at the Psychiatric Center in Pikeville, Kentucky. Dr. Jay Narola, who treated her at the Psychiatric Center, noted that the claimant appeared depressed, nervous, and irritated with a guarded affect. Although the claimant denied having suicidal or homicidal ideas, hallucinations, or bizarre delusions, she stated she gets paranoid ideas. The claimant also informed Dr. Narola that she had a PTSD diagnosis previously.[5] He suggested starting medications for "clinical depression with anxiety or panic condition." (R. 351-52).

On May 4, 2011, the claimant was admitted to Hall Regional Medical Center in Paintsville, Kentucky for shortness of breath. During her hospital stay, Dr. Charles Hardin diagnosed her with anxiety. (R. 418-424).

The Office of Disability Determination Services referred the claimant to Dr. Robert Estock for a psychiatric evaluation. On October 28, 2011, Dr. Estock, attempted to this evaluation, but the claimant did not show up for her appointment and failed to respond after two

---

[3] The record is unclear what type of medicine Dr. Majmundar practices. However, the claimant noted in her patient questionnaire for Dr. Majmundar that she had recently moved to Kentucky and "need[ed] referral, meds," so the claimant may have seen Dr. Majmundar in pursuit of this referral. (R. 359).

[4] Dr. Gutti's history and physical record for the claimant refer to the claimant as a "pleasant white male" and a "well nourished pleasant gentleman." However, the age, past medical history, height, and weight descriptions of the patient match the claimant's other medical records, regardless of this unfortunate slip as to gender. (R. 347-48).

[5] The claimant's medical records do not reveal a PTSD diagnosis before Dr. Narola examined the claimant.

attempts to reschedule. So, Dr. Estock looked to her past medical records before concluding: "not enough medical evidence in file to rate claim." Particularly, Dr. Estock considered Dr. Gutti's note that claimant had a depressed mental status, Dr. Hardin's anxiety diagnosis, and Dr. Narola's diagnoses of a depressive disorder and an anxiety disorder. (R. 566-78).

Dr. Jess Youngblood, the claimant's primary physician, examined claimant several times from February 2012 to August 2012. Although Dr. Youngblood never noted anxiety in his evaluations, his medical records acknowledged her previous anxiety diagnosis and he continued to prescribe Klonopin for her. (R. 651-671).

*Physical Limitations*

The claimant received treatment for back pain in early 2007, and Dr. Matthew Berchuck, the physician treating her, examined a prior MRI scan of the claimant's lumbar spine and believed the claimant suffered central disc herniation. Based upon the claimant's severe pain, Dr. Berchuck recommended a decompression surgery and fusion at the L3-L4 level. (R. 589-90).

On March 9, 2007, the claimant had the back surgery without complications. Dr. Berchuck discharged the claimant from the hospital on March 13, 2007, and scheduled a follow-up appointment for three weeks later. (R. 592).

On March 15, 2007, Dr. Seay Wallace ordered a CT L-Spine for the claimant after she suffered a fall. Dr. John Yeoman interpreted the scan and noticed no acute fractures, but found post-surgical changes and no acute abnormalities. (R. 682).

On June 25, 2007, Dr. Stephen Jones examined the claimant at the Gadsden Regional Medical Center emergency room for sharp back pain exacerbated by movement. The claimant had this pain for three months after she failed to keep her post-operative follow-up appointment.

(R. 613-14, 617).

The claimant periodically saw doctors about her low back pain for two years. On October 11, 2008, Dr. Dwight McGlohon at Deaconess Hospital in Oklahoma City, Oklahoma diagnosed her with lumbar strain/sprain and sciatica, and he prescribed medication for her pain. Dr. McGlohon also noted that the claimant was an "obese adult." (R. 619-25).

On March 19, 2009, Dr. Henry Born examined the claimant, at the request of Disability Determination Services, regarding her first claim for benefits, and he determined that she suffered from failed back syndrome and possible fibromyalgia. Dr. Born also noted that "she is quite a bit overweight and that is not helping matters any." (R. 630-31).

Dr. Robert Heilpern performed a residual functional capacity assessment on the claimant on April 6, 2009, during the time of her initial claim. He concluded, like Dr. Born, that the claimant suffered from failed back syndrome and possible fibromyalgia. She had no manipulative, visual, or communicative limitations, but could only occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl and could never climb ladders, ropes, or scaffolds. He also indicated the claimant should avoid concentrated exposure to vibration and all exposure to hazardous environments. (R. 636-39).

On October 19, 2010, Dr. Sujata Gutti performed a nerve conduction/electromyography, which was difficult to perform due to the claimant's large muscle mass. (R. 349).

Dr. Sathyan Iyer performed a physical examination of the claimant on September 10, 2011 at the request of Disability Determination Services. Dr. Iyer concluded that the claimant had significant impairments in standing, walking, squatting, climbing, working at heights, working around moving machinery, lifting, bending, carrying, and doing overhead activities.

However, he did not believe she had any limitations in sitting, handling, hearing, or speaking. (R. 563). Dr. Iyer also listed her height as 5'03" and her weight as 271 lbs., noting "she is obese." (R. 561).

On October 28, 2011, Dr. Richard Whitney performed a residual functional capacity assessment. Dr. Whitney diagnosed the claimant with "DJD of left knee" and morbid obesity. Dr. Whitney determined the claimant could occasionally lift twenty pounds; frequently lift ten pounds; stand and/or walk about six hours in a normal eight hour day; sit about six hours in an eight hour day; and push and/or pull an unlimited amount. Dr. Whitney found the claimant suffered no visual, manipulative, or communicative limitations. Additionally, Dr. Whitney determined the claimant should avoid all exposure to hazards, such as machinery and heights, but she could tolerate unlimited exposure to other environmental situations, such as extreme cold, extreme heat, wetness, humidity, noise, vibration, and fumes, odors, dusts, gases, and poor ventilation. (R. 580-87).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for Social Security and SSI, the claimant requested and received a video hearing before an ALJ on March 28, 2013. (R. 166, 171, 175). The claimant testified that she was unable to work due to her serious back condition with uncontrollable back pain, severe numbness on her left side, and CHF, although her biggest problem is "the chronic back." She explained that although she had back surgery in 2007, she has had no improvement since the surgery. (R. 96).

The claimant rated her constant pain at a level eight before she takes her medication, although her pain never drops below a level six. Cold temperatures, extended periods of standing

or sitting, and stooping or bending over, exacerbate her pain. The pain is a "serious sharp electric pain," and she is unable to lift more than seven or eight pounds. Additionally, her medication causes her to feel "extremely sleepy" and dizzy, rendering her unable to drive. (R. 97-99).

The claimant testified that physical therapy after her surgery did not help her pain level at all, and that her only relief from the pain is when she is asleep and unaware she is in pain. Further, her prescribed leg braces are "almost impossible" to use at night, as she was instructed, although her cane does help her to walk sometimes. She experiences numbness on her left side daily, and sometimes wakes from sleep because of it. She claimed that her physician believed it to be some sort of nerve damage, after reviewing an MRI, although he did not have any plan to treat it. (R. 100-01).

She testified that she takes Lasix to remove fluid from her heart, as a treatment for her CHF, along with her blood pressure medication. Her medications have improved, but not cured, her CHF. However she stated that, because of her medication, she experiences sudden shortness of breath and incontinence, and her doctor believed it could also be a source of her fatigue. According to the claimant, her doctor also recommended that she quit smoking, and she has cut back to less than half a pack of cigarettes a day. (R. 102). She struggles to catch her breath when she walks more than two or three aisles of the grocery store, and she experiences fatigue and swelling in her feet and fingers, although her medication helps. (R. 103). She also acknowledged that "nothing will help" her asthma until she quits smoking. (R. 104).

Although her physician in Oklahoma approved gastric sleeve surgery for weight loss, she never had this operation. (R. 102). The claimant testified that she continues to lose weight slowly by changing her eating habits, but she is unable to exercise "in the conventional way." (R. 105)

She lived in a house with friends until the week of the ALJ hearing. While living with friends, she performed household chores, like folding laundry and cooking while sitting down. She testified that she had been unable to do any chores outside the house, such as gardening, because she could not bend over. Aside from folding the laundry and cooking, the claimant said she sleeps "quite a bit," reads, and watches a little TV. (R. 105-06). Further, the claimant detailed that she lies down for about 45 minutes three times a day to relieve her pain and prefers to "prop up against the couch" because she experiences extreme pain when she lies flat. (R. 108).

The claimant testified that she lost her Medicaid coverage because she did not receive her recertification paperwork after moving so frequently. Additionally, Dr. Youngblood, her primary care physician, said he would no longer write narcotics prescriptions for her because she had failed her drug screen. The claimant testified that she failed her drug screen because the bottle of her medication fell under her car seat on the day she picked it up, and she could not take the medication as directed. Without the prescription drugs evident in her system, she failed her drug test because she had not taken the medication as prescribed. (R. 109-10).

The ALJ asked Norma Jill Jacobson, a vocational expert, to consider a hypothetical individual with the claimant's age, education, and work history, who is able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; sit six of eight hours; can stand or walk six of eight hours; occasionally climb ramps, stairs, balance, stoop, crouch, kneel, and crawl; can maintain attention and concentration for two hours at a time; should never climb ladders, ropes or scaffolds; should avoid all exposure to workplace hazards and concentrated exposure to environmental irritants; and is limited to frequent fingering and handling on the left, with the left upper extremity. Ms. Jacobson testified that this individual would not be able to perform the

claimant's past work, although this individual would be able to perform other jobs in the national economy. Ms. Jacobson provided three examples of other work this individual could perform: an unskilled entry-level general office job as a mail clerk, retail clerk, or cashier. (R. 113).

The ALJ then asked if Ms. Jacobson would have a different opinion if the individual were also limited to "frequent pushing and/or pulling" with the left upper extremity as well as the left lower. Ms. Jacobson did not change her opinion based on this new fact. Additionally, the ALJ asked about the same hypothetical individual limited, however, to occasionally lifting or carrying ten pounds, frequently lifting or carrying less than ten pounds, sitting six to eight hours, and "standing and/or walking two of the eight." Ms. Jacobson testified that this individual would still be able to perform jobs in the national economy, such as general office clerical help, information and interview clerks, and cashiers. (R. 113-14).

The claimant's attorney then asked Ms. Jacobson about the same hypothetical individual who needs to sit or stand every thirty minutes and requires a cane for ambulation. Ms. Jacobson testified that the individual could still perform the sedentary jobs if "it's just a matter of changing positions after 30 minutes." However, when the attorney asked Ms. Jacobson about the same individual that also needs to lie down for forty-five minutes, three times a day, Ms. Jacobson testified there would be no jobs that individual could perform. (R. 115).

*The ALJ Decision*

On May 13, 2013, the ALJ issued an opinion finding the claimant was not disabled under the Social Security Act. First, the ALJ found that the claimant had not engaged in substantial gainful activity since March 25, 2011. Next, the ALJ determined that the claimant had the following severe impairments: morbid obesity, degenerative joint disease, hypertension, asthma,

and gastroesophageal reflux disease. The ALJ also found the record did not contain "evidence of any mental impairment," based on the evaluation by Dr. Estock. (R. 79; *see also* R. 578). Furthermore, the ALJ noted that the claimant's impairments did not, singly or in combination, meet or medically equal the severity of a listed impairment. (R. 79).

After considering the entire record, the ALJ found that the claimant has the residual functional capacity to perform sedentary work with the following limitations: can lift and carry ten pounds occasionally and less than ten pounds frequently; can sit for six hours in an eight-hour day; can stand and walk for two hours in an eight-hour day; can never climb ladders, ropes, or scaffold, but can occasionally climb ramps and stairs; can occasionally balance, stoop, crouch, kneel, and crawl; can maintain attention and concentration for two hour periods; can frequently finger and handle with the left upper extremity; can frequently push and/or pull with the left lower extremity and the left upper extremity; must avoid all exposure to workplace hazards such as dangerous machinery and unprotected heights; must avoid concentrated exposure to environmental irritants such as dust, fumes, odors, and gases; and must avoid poorly ventilated areas. (R. 79-80).

The ALJ considered medical and opinion evidence, as well as the claimant's testimony, to determine the claimant's residual functional capacity. The ALJ found that Dr. Iyer's opinion concerning the claimant's impairments and inabilities was consistent with his findings upon physical examination of the claimant and the objective evidence as a whole. So, the ALJ found Dr. Iyer's opinion "entitled to great weight." The ALJ gave little weight to Dr. Whitney's conclusions because "evidence received at the hearing level shows that the claimant is more limited" than Dr. Whitney concluded in his residual functional capacity assessment of the

claimant. (R. 82).

The ALJ concluded that the claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms. However, the ALJ found the claimant's statements about the intensity, persistence, and limited effects of her symptoms were not entirely credible. (R. 80). The ALJ noted that, although the claimant alleges her knee pain is the source of her limited bending, climbing, and squatting abilities, she has not received any treatment for the knee pain since a November 2010 x-ray showed only minor changes in the knee. Additionally, the ALJ mentioned that although the claimant understands her asthma would not improve until and unless she stopped smoking, the claimant continues to smoke. The ALJ also discussed that the claimant's obesity exacerbates her pain, but it does not prevent her from completing a full range of activities of daily living. (R. 81).

After assessing the claimant's residual functional capacity, the ALJ found that the claimant was unable to perform past relevant work. The ALJ noted the claimant's age, education, work experience, and residual functional capacity, and found jobs that existed in significant numbers in the national economy that the claimant could perform. The ALJ referenced the testimony of the vocational expert and listed the jobs that the vocational expert stated that the claimant could perform: general office worker, information clerk or interview clerk, and cashier. (R. 84). Therefore, the ALJ concluded the claimant was not disabled under the Social Security Act. (R. 84).

*Records Submitted to the Appeals Council*

After the ALJ's decision on May 13, 2013, the claimant submitted to the Appeals Council on August 5, 2013 medical records from Oklahoma Diagnostic Imaging and the AA Spine

Center. (R. 317-18). The scans from Oklahoma Diagnostic Imaging on February 24, 2010 reveal degenerative disc disease at several cervical levels. (R. 757). The records from the AA Spine Center demonstrate continued treatment for the degenerative disc disease and cervical pain from September 16, 2009 to July 13, 2010. (R. 758-81).

On August 22, 2013, the claimant submitted to the Appeals Council records from her visit to the Gadsden Regional Medical Center from June 1, 2013 to June 3, 2013, and records from her August 13, 2013 visit with Dr. David Wilson, a psychologist with Gadsden Psychological Services. (R. 336). During her stay at the Gadsden Regional Medical Center, Dr. Ghandi Anurag diagnosed the claimant with pre-diabetes, tobacco dependence, chronic pulmonary disease, hypertension, and anxiety with a possible conversion disorder. At this time, her MRI was normal, although she presented with stroke symptoms, such as a facial droop. Dr. Anurag noted that her echocardiogram was normal although the claimant said she had a history of CHF. (R. 34).

On August 13, 2013, Dr. Wilson diagnosed the claimant with bipolar disorder. He also noted that she experiences symptoms of post-traumatic stress disorder. (R. 10-15). Dr. Wilson found that the claimant has extreme limitations in her understanding, memory, and social interaction capabilities. Further, he noted that her sleep and appetite disturbance, decreased energy, difficulty concentrating or thinking, thoughts of suicide, and marked restriction of activities in her daily living characterize her depressive syndrome. He also noted that her motor tension, autonomic hyperactivity, apprehensive expectation, recurrent and intrusive recollections of a traumatic experience, and marked difficulties in social functioning demonstrate her generalized anxiety. (R. 8-9).

## VI. DISCUSSION

**The Appeals Council erred when it failed to remand the case to the ALJ based on the new, chronologically relevant, and material evidence submitted by the claimant.**

The claimant argues that the Appeals Council erred in failing to remand the matter to the ALJ based on the newly submitted evidence from the Gadsden Regional Medical Center and Dr. Wilson. The court agrees and finds that the Appeals Council erred by failing to remand the case to the ALJ based on this new evidence.

While staying at Gadsden Regional Medical Center for stroke-like symptoms, Dr. Anurag diagnosed the claimant with anxiety with a possible conversion disorder, among other, physical, conditions. Dr. Wilson, based on his evaluation of the claimant's medical records and his examination of the claimant, diagnosed the claimant with bipolar disorder, serious hypertension, recent stroke, back problems, fibromyalgia, and asthma, also noting that she suffers from post traumatic stress disorder symptoms.

In its denial of the claimant's request for review, the Appeals Council acknowledged the newly submitted evidence, but stated that because the "information is about a later time...it does not affect the [ALJ's] decision" that the claimant was not disabled on or before May 13, 2013. (R. 2). However, the court agrees with the claimant that the records from the Gadsden Regional Medical Center and Dr. Wilson present new, chronologically relevant, and material evidence and finds that a reasonable possibility exists that the evidence submitted to the Appeals Council may have changed the administrative result had that evidence been before the ALJ initially.

In determining whether to review the ALJ's decision, the Appeals Council must consider any new, chronologically relevant, and material evidence submitted after the ALJ's decision.

*Washington*, 806 F.3d at 1320. Chronologically relevant evidence relates back to issues that were present during the alleged disability period, rather than demonstrating a condition that has arisen since the ALJ's decision, and material evidence creates a reasonable possibility that the evidence could change the ALJ's administrative result. *Id.* at 1321; *Belyeu*, 2015 WL 1490115 at *5.

The court finds that the Appeals Council did not properly evaluate whether the newly submitted evidence was chronologically relevant or material. During the claimant's stay at the Gadsden Regional Medical Center from June 1, 2013 to June 3, 2013, two months after her March 28, 2013 video hearing with the ALJ, Dr. Anurag diagnosed the claimant with pre-diabetes, tobacco dependence, chronic pulmonary disease, hypertension, and anxiety with a possible conversion disorder. The anxiety and possible conversion disorder diagnoses, in particular, relate back to her previous anxiety diagnoses and treatments from Dr. Narola, Dr. Hardin, and Dr. Youngblood, a condition present from at least 2010-2012, which overlaps with the relevant disability period of March 25, 2011-May 13, 2013. (R. 351-52, 418-24, 651-71). These anxiety diagnoses also relate back to the claimant's original filing for benefits, in which she stated she was unable to work because of anxiety, depression, and PTSD. (R. 271).

Furthermore, the claimant met with Dr. Wilson in August 2013, and he diagnosed her with bipolar disorder, based on her medical records and his evaluation of the claimant. (R. 15). While a diagnosis of bipolar disorder may arise in the time since the ALJ's opinion, the court finds it unlikely that this mental disorder arose in three months. Rather, this condition relates back to parts of her original claim - that she suffers from anxiety, depression, and PTSD - as well as her anxiety and depressive disorder diagnoses. (R. 271, 351-52, 418-424). Therefore, the records from Gadsden Regional Medical Center and Dr. Wilson are chronologically relevant.

Additionally, a reasonable possibility exists that this chronologically relevant evidence from Gadsden Regional Medical Center and Dr. Wilson could have changed the ALJ's decision that the claimant is not disabled under the Social Security Act. The ALJ relied on Exhibit C9F, an October 2011 evaluation by Dr. Estock, in finding the claimant suffered from no mental impairments; however, in finding "insufficient evidence" "to rate claim," Dr. Estock noted that he evaluated the claimant's records demonstrating she had depressive disorder and anxiety order diagnoses. Yet, the ALJ interpreted Dr. Estock's conclusion to mean the record presented "no evidence of any mental impairment." (*Compare* R. 578 *with* R. 79).

Furthermore, Dr. Estock's notes show that he evaluated the claimant's medical records in isolation because the claimant did not appear for her first appointment and failed to respond to two attempts to reschedule. However, the diagnoses from the Gadsden Regional Medical Center and Dr. Wilson resulted from direct examinations of the claimant. So, had the ALJ considered the anxiety disorder and possible conversion disorder diagnoses from Gadsden Regional Medical Center and the bipolar disorder diagnosis from Dr. Wilson alongside the claimant's other diagnoses and compared to Dr. Estock's finding that claimant did not suffer from mental impairments, a reasonable possibility exists that the ALJ could have reached a different result.

The records from Gadsden Regional Medical Center and Dr. Wilson are new, chronologically relevant, and material. The Appeals Council erred in failing to remand the case to the ALJ based on this evidence.

The court notes that on August 5, 2013 the claimant also submitted records to the Appeals Council from the Oklahoma Diagnostic Center for February 24, 2010 and the AA Spine Center for September 16, 2009 - July 13, 2010. The Appeals Council did not mention these

records in its refusal to remand the case to the ALJ. On remand, the ALJ should consider these records in making its ultimate decision on disability.

## VII. CONCLUSION

For the reasons stated, this court concludes that the decision of the Commissioner is due to be REVERSED and REMANDED. The court will enter a separate Order in accordance with this Memorandum Opinion.

DONE and ORDERED this 21st day of March, 2016.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE